MOFFATT, EX'R, v. CORNING.

1. SET-OFF — LEGAL EFFECT OF A PURCHASE BY A DEBTOR OF HIS OWN CONTRACT OBLIGATIONS FROM ONE WHO OBTAINED THEM FROM HIS CREDITOR AS COLLATERAL SECURITY.— The attachment creditor of a mining corporation entered into a written contract with a prior judgment creditor of the same corporation, whereby he stipulated to purchase in his own name the debtor's mining property, at the judicial sale thereof, and to work the property for the benefit of both, with an option to either pay the claim of the prior judgment creditor, and thus obtain full title to the property, or to resell it and after payment of all claims against it to divide the surplus with the other party. The latter party assigned this contract, together with his judgment, to one to whom he was indebted, as collateral security. The attachment creditor, having purchased the property, in pursuance of his contract, purchased the contract itself from the assignee thereof, without any negotiation with the judgment creditor, obtaining also at the same time a transfer of the latter's judgment, the consideration being the payment of a certain sum of money in full satisfaction and discharge of the assignee's demand against the judgment creditor. The legal effect of the latter transaction was simply to entitle the purchaser to a credit on his contract with the judgment creditor of the sum actually paid the assignee for the transfers — not to invest him with such absolute ownership of the contract and judgment as to operate as a satisfaction or release of his contract obligations with the judgment creditor.

2. SAME — LIABILITY OF THE ATTACHMENT CREDITOR TO ACCOUNT FOR
PROFITS REALIZED FROM OPERATION OF THE MINE.— In an action
to compel the attachment creditor to account for the profits re-
alized from working the mine, as provided by the contract, and it
appearing that the parties thereto had never entered into any
agreement or stipulation for its revocation, he was properly held
liable, less the sum paid by him for the assignment and transfer of
the contract and judgment.

3. EVIDENCE — EXCLUDING MATTERS OF MERE OPINION.— A statement
on the witness stand by the party to whom the contract and judg-
ment had been assigned as collateral security, that he considered
the judgment creditor's judgment paid and settled on receipt by
himself of the price of the transfers. was properly excluded as
being simply his opinion of the legal effect of the transaction.

*Appeal from District Court of Arapahoe County.*

UPON the 18th of November, 1875, appellee commenced
a suit by attachment, in the district court of Boulder
county, against the Nederland Mining Company. On
January 18, 1876, he obtained a judgment for the sum
of $32,490 and costs. Upon the 5th of January, 1876,
Jerome B. Chaffee commenced a suit by attachment
against the same defendant, in the same court, for the
sum of $46,616.66. On the 7th of January, 1876, Anker
and Shaffenburg commenced an attachment suit in the
same court, against the same defendant, for $13,632.55.
The last-named suits were brought to the same term of
court, and were pending and undetermined at the date
of the making of a contract hereinafter set forth. About
the same time, or prior to the bringing of the above
suits, James Pepin commenced a suit against the same
defendant, in the same court, for himself and others, to
enforce a miner's lien against the Caribou lode, the prop-
erty of the Nederland Mining Company, and upon the
21st of January, 1876, obtained a decree for $22,772.73,
wherein it was decreed that, if the defendant mining com-
pany should fail to pay the amount on or before the 21st
of August ensuing, the property should be sold, and a
deed executed to the purchaser. While affairs were in

this condition, on the 1st of June, 1876, appellee, who obtained the judgment as stated above, and Chaffee, made and executed a contract which, after setting out the facts above stated, proceeds: "That it is doubtful whether said company will pay any of said claims, except by process of law, out of its property; that Chaffee owns the claim of Anker and Shaffenburg, and that it is desirable for Corning and Chaffee to unite their efforts to obtain payment of their claims against said company: Therefore, the contract witnessed, that Chaffee and Corning agreed to purchase the liens against said company, or such part as could be procured, on the best terms possible, and that when purchased they should hold such liens jointly; that Corning should not be required to advance any money on account of these purchases, but reserved the right to advance such amounts as he saw fit. Chaffee was to furnish all the money required, and the liens were to be owned by Corning and Chaffee in proportion to the amount of money advanced by each. *Second.* That, after the purchase of said liens, if the company failed to pay the amount of the decree the property should be sold under it, and, if no bid could be obtained sufficient to pay the liens and claims of Chaffee and Corning, the property was to be bid in by Chaffee, and in that event Chaffee was to pay the amount of the bid, and the property was to be held by Chaffee in trust for himself and Corning, as hereinafter stated; that, if the title was acquired by any other person acting for Chaffee, the title was to be held in trust as aforesaid. The interest of the parties was to be determined as follows: Chaffee's interest was to be the amount of his claim against the company, taken at $51,000, with interest at ten per cent. per annum from the date of this contract, added to the amount paid out by him in the purchase of said liens, with interest and costs of sale paid by him; Corning's interest was to be the amount of his judgment against the company, interest and costs of suit, added to

whatever money he should pay out to purchase said liens, with interest; that the sum total of the two claims as above made was to be taken as the unit of value of the property, and the interest of each was to be the proportion that the claims of each bore to the unit of value. *Third.* That as soon as the title could be procured to said property, as aforesaid, Chaffee was to proceed by sale, under execution or otherwise, to get title to the mill owned by said company, and was to endeavor to sell the mine for an amount sufficient to pay Corning's judgment and his own claim, and not for a less sum; that if, by the sale of said lode, enough money was not realized to pay Corning's judgment, and the property was held in trust, as hereinbefore provided, the mill property should be sold under Corning's judgment, or any other lien, and, if redeemed, the redemption money was to be divided between Corning and Chaffee in the proportion that the lode property was held; that if not redeemed, and the title vested in Chaffee, or any one for him, it was to be held in trust by Chaffee in the same proportion; that at such sale the mill property might be bid off by Chaffee or some one for him, and such purchaser would not be required to pay the bid in cash, but the amount should be applied to Corning's judgment. *Fourth.* If the property before described shall be held in trust as aforesaid, the trustee may work and mine the said lode property, or run and use the said mill, and all profits realized therefrom shall be divided between the said Chaffee and Corning according to their respective interests in said property, but the said Corning shall not be liable for any loss sustained in working said property, or running or using said mill. Neither shall any incumbrance be placed on the said property, or any part of it, or any lien be allowed on the same. The said Chaffee may at any time, by payment to the said Corning or his legal representatives of the said judgment, interest and costs, together with the amount he may have paid out in purchasing said miners'

liens and interest thereon, discharge the said trust; and, on the payment of said sums of money as aforesaid, the said Chaffee shall hold the said property, and every part thereof, discharged of any claim of the said Corning thereto. If the said Corning shall receive any money by the redemption of mill property, or by the payment of any money to him on his judgment out of any sums of money bid at such master's sale of said property under such miners' liens, the amount so due him as hereinbefore stated (to be determined by taking the amount of the judgment, interest and costs, and the amount he shall pay for said miners' liens) shall be decreased by the amount so received, and his interest in said property shall be decreased in the proportion that the amount so received bears to the total amount treated as the unit of value. It is the intent of the parties hereto that the said Corning shall be paid out of the amount bid for said property, or out of the amount realized on the sale of the property, if it is held in trust as before stated, the full amount of his judgment, interest and costs, and all moneys he may have used in purchasing miners' liens, and interest thereon. *Fifth.* That in case Chaffee can sell said mine or mill, or both, he shall pay Corning the amount of his judgment, interest and costs, and whatever moneys Corning may have advanced in the purchase of liens, with interest. *Sixth.* That Corning shall aid and assist Chaffee in every way to effect the purposes and objects of this contract. If, at the sale under the decree for a miner's lien, Chaffee shall be compelled to bid an amount greater than the amount of the lien, Corning shall not demand a distribution of the surplus without the consent of Chaffee; but, if a distribution is made, the amount allotted to Corning shall be received by him for and on account of Chaffee, and shall be paid to Chaffee. If the property be held in trust, and not sold, and Corning shall not be paid the amount due him within ninety days from date of the sale under the miners'

liens, then, when Chaffee does make a sale, if the property shall be sold for more than enough to pay himself and Corning, the balance shall be divided in the proportion of their respective interests to the unit of value."

On the 19th of October, 1880, Corning instituted this suit against Chaffee, and in his complaint, after setting out the foregoing contract, alleges, in substance, that the Caribou lode, one thousand four hundred feet in length, was sold under the decree in the Pepin suit, and bought by Chaffee for $64,000; that on the 15th of September, 1876, a deed of it was made and delivered to Chaffee; that Chaffee entered into possession of the mine, and worked it; that afterwards the mill-site and mill were sold at sheriff's sale, and bought by Chaffee, and he acquired title to them. It is also alleged that upon the 8th of November, 1876, Corning was indebted to the Colorado National Bank and C. B. Kountze in the sum of about $30,000, and that to secure its payment he assigned his contract with Chaffee to Kountze by a written contract in substance as follows: Empowers Kountze "to receive all moneys due or to become due, and also to receive a deed for the interest of Corning in the property described in the contract, and also empowers Kountze, out of any moneys received on said contract, to pay himself . and the Colorado National Bank the amounts due them from Corning, or, if sufficient money be not received by Kountze to pay said amounts, he shall receive the deed for the property, and hold the same in trust for the payment of such moneys; and, in case sufficient money be not received on or before the 1st of September, 1877, to pay Kountze and the bank, the former is authorized to sell the property to pay himself and the bank, and the surplus, if any, to be paid to Corning."

It is also alleged that on the 17th of April, 1879, Corning borrowed from Chaffee $30,000 to pay the amount he owed the Colorado National Bank and Kountze, and made his note for the same with interest at ten per cent. payable on demand; that Chaffee paid Kountze the

amount, $30,000, and took an assignment of the contract between Corning and Kountze, as follows: "Denver, Colo., April 17, 1879. For and in consideration of the sum of $30,000, I hereby, with the consent of George C. Corning, assign and transfer all my right, title and interest in and to the annexed contract regarding the Caribou property to Jerome B. Chaffee, said contract entered into between Jerome B. Chaffee and Geo. C. Corning on the 1st day of June, 1876, and held by me as collateral security for indebtedness due to myself and the Colorado National Bank of Denver from said Corning, which sum of $30,000 is to be received by me in full of said indebtedness; it being the intent of this assignment to give to said Jerome B. Chaffee all the rights I have in said contract, and none other, without recourse on me in any event.    C. B. KOUNTZE.

" I hereby consent and agree to the above assignment. GEO. C. CORNING."

It is further alleged that on the 25th of April, 1879, Chaffee sold and conveyed the mine and mill property to the Caribou Consolidated Mining Company for a sum sufficient to pay all claims of himself (Chaffee) and Corning; that Chaffee still retained Corning's note for $30,000; that he had not paid him any part of the purchase money received from the sale of the property; had not paid his judgment against the Mining Company Nederland, nor any part; and avers that there was due him $50,000 for the judgment, and that, if there was any surplus in the hands of Chaffee after paying off the claims provided for in the contract, he was entitled to a portion of it. Prays for an accounting, and for a decree for what might be found due.

On November 17, 1880, an answer was filed by Chaffee; on November 24, 1880, a replication. Upon February 29, 1884, leave was obtained of the court, and an amended answer filed; of which only portions are necessary to be noticed.

Defendant denies that he, on the 17th of April, 1879,

or at any time, loaned plaintiff $30,000 to pay the debt due from him to Kountze and the bank. Denies that he ever received a note for $30,000 from plaintiff, or that he then held and controlled such a note. Denies that any such note was made at his request, or for his use, or was ever delivered to him, or to any one on his behalf entitled to receive the same. Avers, in effect, that he never loaned money to plaintiff to pay Kountze and the bank; that plaintiff never paid money to Kountze and the bank. Admits, on information and belief, that on the 17th of May, 1879, plaintiff executed a note for $30,000 and interest, and left it with some clerk or person in the First National Bank. Avers that, at the time he was in New York, knew nothing of it; never authorized any one to receive it. Avers that, by the contract of assignment from plaintiff to Kountze of April 17, 1879, Kountze became the absolute owner of plaintiff's judgment against the Mining Company Nederland, and the absolute owner of all interest plaintiff had before that time in the contract made by him with defendant of June 1, 1876, by reason of the assignment of plaintiff to him. And further avers that on the 17th of April, 1879, plaintiff was indebted to Kountze and the bank in the sum of not less than $40,000, and that on that day defendant purchased from Kountze and the bank, for the sum of $30,000, such indebtedness of plaintiff, with his full knowledge and consent, and that Kountze and the bank received the amount as full payment of the amount due them from plaintiff, and released and discharged him, and that such sum was a full and complete payment of the judgment of plaintiff against the Mining Company Nederland, and of all claims and dealings between plaintiff and defendant, and in full discharge of all the covenants and agreements contained in the contract of June 1, 1876, between plaintiff and defendant, and that, upon the assignment to him (Chaffee) by Kountze of the judgment and contract, he took them

free from all claims and liability by reason of the former agreement. Averring, in effect, that the payment of the $30,000 to Kountze was a settlement and payment in full of all matters between defendant and plaintiff, and that defendant was discharged of all trusts arising under the contract. Denies all indebtedness, and plaintiff's right to an accounting.

On June 11, 1885, a replication was filed to the amended answer, denying all the important allegations, and specifically denying any agreement with defendant whereby the contract of June 1, 1876, should be canceled, or in any way affected, except that the sum of $30,000 paid by defendant to Kountze should be taken as part payment by plaintiff of the amount due, and to become due, on the contract.

The trial was had before the court June 11, 1885, resulting in a judgment in favor of plaintiff for $14,570, from which this appeal was taken.

Mr. L. C. ROCKWELL, for appellant.

Messrs. TELLER & ORAHOOD, for appellee.

REED, C. This litigation grows out of the misunderstanding of the parties in regard to important transactions between them. After the making of the contract by appellant and appellee of June 1, 1876, on the 8th of November of the same year, appellee, being indebted to the Colorado National Bank and Charles B. Kountze in the sum of about $30,000, assigned the contract made with appellant, and with it the appellee's judgment against the Mining Company Nederland, and all rights and equities in the contract, and transferred them to Kountze. This transaction was one entirely between Corning and Kountze, Chaffee not having been a party; and it is not shown that he had any knowledge of it, or in any way participated or was present. As far as is shown, matters remained in this condition until April, 1879, when, Chaffee

being in New York and Corning in Denver, the former entered into negotiations in New York with Augustus Kountze, who represented the Colorado National Bank and C. B. Kountze, in regard to the indebtedness of Corning to them, which resulted in an arrangement whereby Kountze and the Colorado National Bank were to receive $30,000 in full discharge of Corning's indebtedness, amounting then to something over $40,000, and Kountze was to assign to Chaffee the same securities assigned to him by Corning. Corning's consent to the transaction was to be obtained. It appears that C. B. Kountze and Moffatt were telegraphed to secure such consent from Corning. On the 17th of April the transaction was completed. About that time the money ($30,000) was paid, and the assignment by Kountze to Chaffee, as set out above, was executed.

The first question presented for determination is what the character of the assignment from Corning to Kountze of the 8th of November, 1876, was, and the intention of the parties, and its legal effect. It is contended in argument by appellant's counsel that it was an absolute sale and transfer of the judgment against the Mining Company Nederland, and likewise of all Corning's right, title and interest in and to the contract between himself and Chaffee, while, on the part of Corning, it is urged that the transaction was a transfer by assignment to Kountze as collateral security of the indebtedness. The assignments were made by the execution by Corning of two different instruments contemporaneously,—one, of the judgment, absolute and unconditional in its character; the other, of the contract, in substance as follows: That, in consideration of one dollar paid, and in further consideration of the premises to be kept and performed by Kountze, etc., Kountze is empowered — *First*, to receive all moneys due or to become due; *second*, to receive a deed of the interest of Corning in the property described in the contract, if such deed should be made; *third*, out

of any moneys received on the contract, *to pay himself and the Colorado National Bank the amounts due from Corning; fourth,* if sufficient money was not received by Kountze to pay the amounts, he was to receive the deed to the property, *and hold the same in trust for the payment of such money; fifth,* if sufficient money was not received by the 1st of September, 1877, Kountze was authorized to sell the property *to pay himself and the bank, and the surplus, if any, to pay to Corning.*

Taking the provisions and language of this assignment, unsupported by other testimony, it is apparent that it was not, nor intended to be, an absolute sale and transfer, divesting Corning of all interest in the contract with Chaffee, and substituting Kountze in his stead. Such construction, instead of being in harmony, would directly contradict the expressed intention of the parties. Corning and Kountze were the only parties to the contract of assignment. No question arose between them as to the legal effect or the intention of the parties. It was by both, at all times, treated and regarded as a transfer and assignment as collateral security for the payment of the indebtedness, not as abrogating the contract between Corning and Chaffee by substituting Kountze in the place of Corning, but leaving the contract between them in full force. There is another view of the matter; Corning, by the contract with Chaffee and the mutual agreements and covenants, had disposed of all interest in the matters to Chaffee. Chaffee, by virtue of the contract, was the owner of the very property and rights in action that are claimed to have been transferred to Kountze. What Corning was to receive under the contract was money — nothing else — absolutely; and, under any circumstances, the amount of the judgment against the Nederland Company, and any money he might pay for the purchase of claims, with interest on the same, was to be repaid. Chaffee was to have the title to the property, — hold and work it, — and his trust might be dis-

charged by the payments above mentioned at any time, or he might, at his own election, sell the entire property at any time for a sum sufficient to pay all claims and charges; and, if the price obtained should exceed them, then the surplus was to be divided on an agreed basis, and Corning was to receive his proportion. In any event, what Corning was to have was money from Chaffee. At the time it was claimed that Kountze bought the judgment from Corning, Corning was not the owner of it. It belonged to Chaffee. The assignment to Kountze was an idle proceeding, of no legal effect. What he did assign was by virtue of the assignment of the contract, and that was a right to take the money in accordance with the provisions of the contract, instead of Corning, when Chaffee was by its terms required to pay. Kountze was not a party to the contract of Chaffee and Corning. Chaffee was not a party to the contract between Corning and Kountze. The absolute property in the judgment was in Chaffee. Corning could not assign it, and pass a title. Neither could the contract have been assigned to Kountze by Corning, and Kountze be subrogated to his right, unless it was done by the act of Chaffee, by his joining in it. 2 Add. Cont. 839–842; 1 Pars. Cont. 220; 2 Chit. Cont. 1380, and authorities cited in note.

Upon the trial, C. B. Kountze testified, in answer to a question in regard to the judgment of Corning against the Mining Company Nederland: " We simply held it as collateral. We had not bought it. It was ours as a collateral." He further says: " Upon the 8th of November, 1876, Corning's debt to me was still unpaid. The assignment was taken only as collateral security for the debt. Corning owed myself and the bank; and on the 17th of April, 1879, we were still holding it as collateral security." Corning testified to its having been assigned to and held by Kountze as collateral security. Corning and Kountze having been the only parties to the contract or assignment, and both agreeing as to what the transaction

was, it cannot, at the instance of a third party, be declared to be an absolute sale, contrary to the intention of the parties who made it. Neither will the law warrant the court in saying it was an absolute sale by reason of the language used in the assignment of the judgment, when it is shown by the evidence of both parties that it was not their intention that it should be. The assertion of absolute ownership could only have been by Kountze. Having disclaimed it, he could not be invested with it by any act of a third party. There is a further incident that may deserve comment. If Chaffee, at the time of the transaction with Kountze in New York, regarded the transaction between Corning and C. B. Kountze as an absolute sale, which divested the former of all interest in the judgment and contract on the 8th of November, 1876, why did he, on the 17th of April, 1879, require the consent of Corning to be obtained before he would make the deal?

It is clear that by the subsequent assignment made by Kountze to Chaffee, the latter could take by the assignment no greater or better title than Kountze had held. In the assignment of Kountze to Chaffee of April 17, 1879, of the contract between Corning and Chaffee of June 1, 1876, is the following language: "And held by him as collateral security for indebtedness due to myself, and the Colorado National Bank of Denver, from said Corning; * * * it being the intent of this assignment to give to said Jerome B. Chaffee all the rights I have in said contract, and none other." Consequently, by virtue of the transaction with Kountze, aside from anything that may have occurred in connection with Corning, Chaffee, having paid and discharged the debts of Corning by compromise or composition, and succeeding to the securities, held them, by virtue of the assignment, only as collateral for the sum of money advanced; he was substituted for Kountze, and held the same collateral security for a less sum of money by reason of the

advance or loan of the $30,000. It will be observed that by the terms of the contract entered into between Chaffee and Corning, Chaffee had obligated himself to pay, in any event, the amount of Corning's judgment against the Mining Company Nederland, with the interest. It does not appear that, by the terms of the contract, stipulated events had occurred to make the money due, so that Corning could have demanded the payment. But it was optional with Chaffee at any time to relieve himself of all subsequent liability by the payment in full of that claim.

The act of Chaffee in making the payment of $30,000 at the time can only be regarded as falling within one of the three following propositions: *First*, that it was a loan of that amount to Corning, to be subsequently settled and adjusted; *second*, that by the deal with Kountze all parties were relegated to their original *status* under the contract, with $30,000 of the money due Corning paid by Chaffee; or *third*, that, by a subsequent contract made between Chaffee and Corning at the time of the payment to Kountze, the former contract was abrogated, and it was agreed that the amount paid Kountze should be accepted by Corning as payment in full under the contract and Chaffee discharged from all further liability.

The testimony is very vague and indefinite. Chaffee was in New York, dealing with a representative of Kountze, while Kountze and Corning were in Denver. It is unnecessary to say that Corning could not be bound by any understanding or agreement between Chaffee and Kountze to which he was not a party. It is evident that, in contemplation of law, there was no contract between Chaffee and Corning. At the very time of closing the transaction, each was acting on a theory of his own, and at variance with that of the other. Corning supposed it to be a loan, and it appears that C. B. Kountze so supposed it; and they thought it necessary for Corning to make a note for the amount, which he did, and delivered

to some one in the First National Bank, supposed to represent Chaffee. It is in evidence that no note was required or authorized by Chaffee, and that it was never accepted or received by him, or an authorized agent in his behalf. The theory of a loan was abandoned upon the trial, and was not urged in argument, for the obvious reason that no contract for a loan was made, or could be proved. The fact was established that no person in the First National Bank was authorized to receive the note. It sufficiently appears that the officers of the bank participated to some extent in the transaction as representing Chaffee, and it appears that they had no definite knowledge of what the real character of the transaction was; but it is fair to presume that their agency or duty was such as to require them at least to inform Chaffee of the delivery of the note, and the light in which the transaction was regarded by Corning. Yet it appears that there was no effort made to inform Corning of Chaffee's view of the matter until a long time after, and no offer or attempt to return the note, and it remained in the custody of the bank to the time of the trial.

The second of the above propositions needs no discussion. It results as a conclusion of law, unless the new contract was established.

The third proposition is not without difficulty, and its solution practically disposes of the case. If a contract was made, the two parties radically disagree as to what it was. Chaffee construes it to have been such that, by payment of the $30,000 to Kountze in the way of compromise, and the discharge of Corning from further liability, and the transfer of securities held by Kountze, he took them divested of all obligations assumed in the contract, and that the payment of the $30,000 by him canceled his obligation to pay the judgment of Corning against the Mining Company Nederland, of $32,490, in January, 1876, with interest to April, 1879, amounting to over $10,000, making the aggregate debt at that time

over $42,000. Corning asserts, in the first instance, the transaction to have been a loan of the $30,000; when that position was found untenable, then that it was a payment of that amount on account under the contract. Without consent from Corning, Chaffee had an undoubted right to buy from Kountze the indebtedness of Corning at any agreed price, and taking by assignment any security held by Kountze, and could, upon settlement, have exacted from Corning the whole amount. To have done this, the evidence of indebtedness should have been assigned to him, as well as the securities. He would then have had the title to the indebtedness, and the same security Kountze held, unless, by the merger of the two, he was relegated to his original contract. Had it been his intention at the time to make for himself the difference of $12,000 and over by the transaction with Kountze, this would have been the proper and rational course; but this was not done. The evidences of Corning's entire indebtedness, on the payment of the $30,000, were canceled and delivered to Corning, evidently by the order or consent of Chaffee, while the securities held for the indebtedness by Kountze were assigned to Chaffee, and could only have been held by him legally, as security for the $30,000 advanced, unless by special contract with Corning. Having had in the first instance, as shown, a right to elect whether he would treat the transaction as a purchase or as a loan, or an advance under the contract, he must be held to have made his election; and having made it, and it having been acted upon, it was final and conclusive. It is a primary and elementary principle that in the making of a contract the minds of the contracting parties must meet. Without this, there is no contract. As is said in 1 Chit. Cont. 11: "There must be, first, the reciprocal or mutual assent of two or more persons." In Add. Cont. 1: "Every contract includes a concurrence of intention between two parties." In *McNulty v. Prentice*, 25 Barb. 204, it is said: "A contract

(*con-traho*) is a drawing together of minds until they meet." In 1 Pars. Cont. 475, it is said: "There is no contract unless the parties thereto assent, and they must assent to the same thing in the same sense." See *Hazard v. Insurance Co.* 1 Sumn. 218.

In order to have abrogated or annulled the contract existing between Chaffee and Corning for the payment of the entire amount of Corning's judgment and interest, and a portion of any surplus that might remain on the sale of the property which Chaffee had obligated himself to pay absolutely, there must have been a new contract taking the place of the old one, whereby Corning agreed to accept a less sum in full, and on the receipt of such sum release Chaffee from further liability. This would have required a proposition on the part of Chaffee to purchase, cancel and discharge all debts and obligations of Corning's to Kountze and the Colorado National Bank, in consideration of Corning accepting the same in full satisfaction of all liability on the part of Chaffee arising or growing out of the contract, and an acceptance of the proposition by Corning. Was there a contract of that kind, or of any kind, established by the evidence?

Chaffee testified: "Augustus Kountze, of New York, agreed with me that he would take $30,000 in full for his debt against Corning, and also in full for the contract that I had that he had assigned. He would assign it over to me for $30,000; but I was not exactly satisfied with taking that assignment, knowing that I had been a trustee in the matter, and for that reason I had it referred back here to Mr. Moffatt to get Mr. Corning's consent to that assignment from Mr. Kountze to me; and, if he could get that consent, I told him I would give him the $30,000. I would give Kountze the $30,000, which should pay in full the Corning debt, provided Corning would agree to it and make no claim upon me whatever. That was Corning's debt to Kountze and the bank. The

understanding between Augustus Kountze and myself was, and the agreement was, that, if that was assigned to me, that canceled my contract with Corning. That was our understanding, and I wanted Corning's assent, which was obtained here in Denver and telegraphed me, and I paid the money." Upon cross-examination he testified: "I did not have any conversation with Corning personally about the transaction. By the Court: Mr. Chaffee, were there any other written negotiations or written instruments in reference to this transfer, other than those that have been read here to-day, which you had any knowledge of,— as your contract with Corning, his assignment to Kountze, Kountze's assignment to you; those three instruments? Answer. I think that comprised the whole, with Corning's consent that he should transfer this contract to me. Question. Other than the assignment of judgment that Mr. Rockwell has just introduced in evidence? A. I think that was all. That was all I thought I needed. Q. This consent you speak of is what is marked on that assignment of Kountze's to you? A. I presume it was. It was telegraphed to me that he had consented to have the transfer made. Q. You had no knowledge to what extent that consent of his went,— only your talk with Kountze? A. I thought I knew what it meant. Perhaps I didn't. I guess I didn't, according to your idea of it. Q. Whatever you thought was derived from your talk with Augustus Kountze, was it not? A. It was, and derived from our dispatches, letters, and documents and papers, back and forth. Q. You have never seen or heard of any other consent of Mr. Corning's, or anything relating to this contract, except such as is indorsed on that contract? A. I don't know of anything. The original contract between myself and Corning was delivered to me by Kountze. The original contract in the assignment of the judgment was what I understood was assigned to me."

Corning testified: "I understood that he [Kountze]

was selling this contract, and he was delivering over the collateral of mine that he held. The payment of the $30,000 settled between Mr. Kountze and myself, and he assigned my collateral to Mr. Chaffee in the settlement. Q. And he surrendered to you everything you owed him and the Colorado National Bank? A. Yes, sir; he gave me my notes. Q. Did you not assent to this assignment upon the condition, and only upon the condition, that the bank should release you from all your obligations? When I say the bank, I mean the bank and Kountze together. A. The $30,000 went to pay Mr. Kountze, and he assigned this to Mr. Chaffee as the collateral for the other $30,000, and I consented. He assigned this as collateral to Mr. Chaffee, and to that I consented."

This is all the testimony of any importance on the point, and it certainly is not sufficient to establish such a contract as is contended for by appellant. There is no evidence that Chaffee, or any one, informed Corning that the $30,000 to be paid was to be in full of all claims growing out of the contract; and the only evidence that such was the understanding of Chaffee is his own, when he states that to have been the understanding or contract between him and Augustus Kountze. It is needless to say that any understanding or agreement between himself and Kountze could not affect the interest of Corning unless he was a party to it, or informed of the extent of the transaction as claimed by Chaffee. Chaffee may have supposed and intended that the fact would be communicated to Corning here, but there is no evidence that it ever was; nor can such knowledge be predicated upon his consent to the transaction. He was informed that Chaffee proposed to pay off his entire indebtedness of over $40,000 for $30,000, and that his notes were to be canceled and delivered to him,— a transaction clearly for his benefit; and his only care was to assure himself that he was fully released from such indebtedness. The consent obtained, and the extent of it, can only be determined by

the written document upon which it was indorsed, and it cannot lawfully be extended. The paper was the assignment executed by Kountze to Chaffee, whereby, for the sum of $30,000, he assigns and transfers all his right, title and interest in the contract held by him as collateral security for indebtedness due himself and the Colorado National Bank, etc., upon which is indorsed: "I hereby consent and agree to the above assignment," which is signed by Corning. Comment upon the extent and intention of the consent is unnecessary. It is apparent at a glance that the consent only extended to agreeing that that document should be assigned to Chaffee, and held by him as collateral security in the same way it had been held by Kountze for the $30,000 paid Kountze.

It has already been shown that, had the indebtedness of Corning, and the securities for it, been transferred to Chaffee, he would have been subrogated, and his relation to the indebtedness and securities would have been the same as that of Kountze. Such was not the case. The debt, which was the principal, had been canceled. Hence the two were separated. " 'Collateral,' in its common use and acceptation, means additional, subsidiary security given to secure the principal obligation. It is a separate obligation." It is said in Coleb. Coll. Secur. § 2: "Such collateral security stands by the side of the principal promise as an additional or cumulative means for securing the payment of the debt." Judge Redfield, in a note to *Le Breton v. Peirce*, 1 Am. Law Reg. (N. S.) 38, says: "The etymology of 'collateral security' indicates that it is something running along with, and, as it were, parallel to, something else of a similar character. It is collateral to the original indebtedness."

It will be seen that by the consent of Corning, and the transfer of the collateral, it could not have been transferred as security for, and to the amount of the indebtedness formerly held by, Kountze, as that had been extinguished. Hence it was, by the acts of the parties,

transferred to Chaffee, not to secure the original debt, but the new debt created from Corning to Chaffee; and that debt, as shown, unless by an agreement, could not have been greater than the advance — $30,000. That Chaffee expected and intended to himself receive the benefit of the transaction, and make the difference of some $12,000, is apparent. Otherwise no motive can be found for making the transaction. That he thought he had done so is apparent. That he did not was by reason of the error committed in dealing with Kountze instead of Corning, and also by an error regarding the law of the case, in supposing he could buy from Kountze the security, and take an absolute title divested of all equities and obligations formerly existing. It follows that no subsequent transaction relieved him from the obligation assumed in the Corning contract, and the payment of the amount of the Corning judgment and interest.

The errors assigned are practically disposed of, except the first: " That the court erred in refusing to allow defendant to prove by Kountze that the judgment of Corning against the Mining Company Nederland was part of the consideration for which defendant paid Kountze $30,000, and that the judgment was paid off and settled by this $30,000, and was so understood between Kountze and Chaffee at the time." The assignment embraces two propositions. In regard to the first, it may be said that Kountze was examined and testified at length in regard to what the transaction was, and of the facts within his knowledge. From the facts and documents executed by Kountze the whole matter had been explained. The defendant could not have been prejudiced by the refusal of the court. It could have been, at most, but the opinion of Kountze from the facts already before the court. The latter part was very properly excluded. It only asked for the opinion of the witness as to the legal effect of the transaction, which could only be determined by the court. The last clause, as to how it was understood be-

tween Chaffee and Kountze, was unimportant, as already shown.   The pertinent inquiry was, how it was agreed and understood between Chaffee and Corning.

The judgment of the district court should be affirmed.

Richmond and Pattison, CC., concur.

Per Curiam.   For the reasons stated in the foregoing opinion the judgment is affirmed.

*Affirmed.*

Mr. Justice Elliott, having tried the cause as district judge, did not participate in this decision.